IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Tara Mathis, | ) | Civil Action No:  8:20-cv-03363-BHH-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| v. | ) | |
| | ) | |
| Commissioner Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Civil Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B).[1] Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI").[2] For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1] A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

[2] Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

## **PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI in 2016. [R. 207–13; *see* R. 19.][3] The DIB application alleged an onset-of-disability date of January 1, 2016 [R. 207], and after an amendment, the SSI application alleged the same onset-of-disability date [R. 47, 193]. The claims were denied initially and on reconsideration by the Social Security Administration ("the Administration"). [R. 85–129.] Plaintiff requested a hearing before an administrative law judge ("ALJ") and on November 8, 2018, ALJ Gregory M. Wilson conducted a de novo hearing on Plaintiff's claims. [R. 43–84.]

The ALJ issued a decision on July 12, 2019, finding Plaintiff not disabled under the Social Security Act (the "Act"). [R. 16–41.] At Step 1,[4] the ALJ found Plaintiff met the insured status requirements of the Act through March 31, 2021, and had not engaged in substantial gainful activity since January 1, 2016, the alleged onset date. [R. 21, Findings 1 & 2.] At Step 2, the ALJ found Plaintiff had the following severe impairments: obesity, lumbar spine degenerative disc disease, left hip osteoarthritis, and left knee degenerative joint disease. [R. 21, Finding 3.] The ALJ also found Plaintiff had non-severe impairments of nonsevere hypertension, anxiety, and depression. [R. 22.] At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 24, Finding 4.]

---

[3]The Court notes that the SSI application in the record [R. 193–206] appears to be an application for Plaintiff's husband, David Mathis.

[4]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra.*

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> I find that the claimant has the [RFC] to perform light work (lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; and sit 6 hours in an 8-hour workday), as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following limitations: she can stand/walk for 4 hours in an 8-hour workday. She can never climb ladder/rope/scaffolds. She can occasionally climb ramp/stairs, stoop, kneel, crouch, and crawl. She can frequently balance. She should avoid concentrated exposure to hazards.

[R. 24, Finding 5.] Based on this RFC finding, the ALJ determined at Step 4 that Plaintiff was unable to perform her past relevant work. [R. 34, Finding 6.] However, considering Plaintiff's age, education, work experience, RFC, and the testimony of a vocational expert ("VE"), the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. [R. 35, Finding 10.] Thus, the ALJ found that Plaintiff had not been under a disability as defined by the Act from January 1, 2016, through the date of the decision. [R. 36, Finding 11.]

Plaintiff requested Appeals Council review of the ALJ's decision but the Appeals Council declined review. [R. 1–7.] Plaintiff filed the instant request for review in this Court on September 23, 2020. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and should be reversed and remanded. [Docs. 14 at 16–28; 16.] Specifically, Plaintiff contends the ALJ erred by improperly evaluating opinion evidence [Docs. 14 at 16–23; 16 at 1–8] and inferring a lack of seriousness of her limitations from her failure to obtain further treatment [Docs. 14 at 24–25; 16 at 8–10]. Plaintiff also argues that the Appeals Council erred in

refusing to grant review based on additional evidence. [Docs. 14 at 25–28; 16 at 10–14]. The Commissioner, on the other hand, contends the ALJ's decision should be affirmed because the record contains substantial evidence supporting the decision. [Doc. 15 at 7–21.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

4

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brenem v. Harris*, 621 F.2d 688, 690–91 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to

5

allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013); *see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.   *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand.").  After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207.

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).  A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court.  *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C.

6

§ 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[5]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## **APPLICABLE LAW**

---

[5]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five-Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).  The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education,

and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule,

the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

**C.    *Meets or Equals an Impairment Listed in the Listings of Impairments***

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[6]  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

**D.    *Past Relevant Work***

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[7] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. §§ 404.1560(b), 416.960(b).

**E.    *Other Work***

---

[6]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[7]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[8] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations). When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines. *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work. 20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy."). The purpose of using a vocational expert is "to assist the

---

[8]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a). A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. 20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker*, 889 F.2d at 50. For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.   Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520. The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

## III.   Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.[9] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see*

---

[9]The Court notes that for benefits applications filed on or after March 27, 2017, the Administration has enacted substantial revisions to the applicable regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Because the applications here were filed in 2016, the revisions are not applicable.

12

*Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c). Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. §§ 404.1527(d), 416.927(d).

13

However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. §§ 404.1517, 416.917.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  Social Security Ruling ("SSR") 16-3p provides, "[i]n considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  Social Security Ruling 16-3p Titles II and XVI:  Evaluation of Symptoms In Disability Claims, 82 Fed. Reg.

14

49,462, 49,464 (Oct. 25, 2017); *see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion); *see also* SSR 16-3p, 82 Fed. Reg. at 49,463. First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce" the alleged symptoms. *Id.*; *see* SSR 16-3p, 82 Fed. Reg. at 49,463. Second, the ALJ must evaluate "the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities . . . or to function independently." SSR 16-3p, 82 Fed. Reg. at 49,464; *see* 20 C.F.R. §§ 404.1528, 416.928 (noting that the ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence).

## DISCUSSION

**Treating Physician Rule**

Plaintiff argues that the ALJ erred by failing to properly apply the Treating Physician Rule. The Court agrees.

Social Security Ruling 96-2p requires that when an ALJ assesses medical opinions, his decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and . . . be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the

treating source's medical opinion and the reasons for that weight." 1996 WL 374188. Moreover, ALJs are instructed to apply the factors provided in 20 C.F.R. §§ 404.1527 and 416.927—including the length and nature of the source's treatment relationship with the claimant, the supportability of the opinion, the opinion's consistency with the other evidence in the record, whether the source is a specialist, and any other factors that may support or contradict the opinion—to all medical opinions. 20 C.F.R. §§ 404.1527(c), (f), 416.927 (c), (f). More weight is generally given to the opinions of examining sources than to non-examining ones. *Id.* Additionally, more weight is generally given to opinions of treating sources than is given to opinions of non-treating sources, such as consultative examiners. *Id*. And, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (internal quotation marks omitted). Furthermore, the determination of whether a claimant is disabled under the Act is a legal determination and ultimately one for the Commissioner, and not a medical source, to make. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (stating "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled"). A medical source opinion on that issue is not entitled to any special weight. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). ALJs are further prohibited from substituting their medical opinions for those of medical providers, which the Fourth Circuit recently referred to as the prohibited practice of the ALJ "playing doctor." *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017).

16

### Brief Medical History

Dr. Melmoth Patterson, a family practice physician, had treated Plaintiff and seen her regularly from at least early 2011.  [R. 56, 364–413; 527–82.]  When he saw her on December 15, 2015, she reported that she had fallen about four weeks before and, although she did not seem hurt at that time, was currently having severe left-hip pain.  [R. 393–94.] She reported she was having trouble urinating and had not had her period in two months. [R. 393.]  Examining Plaintiff, Dr. Patterson noted that she had decreased range of motion and pain in her left hip with internal and external rotation and that she cried with discomfort when she bore weight.  [R. 395.] He assessed arthralgias of the lower left leg, hypertension, degeneration of intervertebral disc of the lumbar region, lateral left hip pain, and generalized osteoarthritis.  [R. 396.]  He also ordered an x-ray of her left hip and refilled her medications. [R. 396.]

On February 8, 2016, Plaintiff went to the emergency room complaining of pain in her left hip and back.  [R. 458.]  She reported that her pain worsened with standing, walking, and lifting.  [R. 458.]  She explained that a few weeks prior she had slipped while working and done a split, and that her pain had followed shortly thereafter.  [R. 458.]  She reported that neither Norco nor Flexeril lessened her pain.  [R. 458.]  An examination revealed mild vertebral point tenderness over her lower lumbar spine, moderate tenderness in her anterior and medial aspect of her hip, and limited range of motion due to pain.  [R. 459–60.]  A CT scan of her left hip revealed moderate loss of superolateral joint space at the left hip,

17

suggestive of ostearthritis.[10]  [R. 415.]  An x-ray of her lumbar spine revealed pre-existing predominantly lower lumbar spine disc and facet joint degenerative disease with degenerative type anterolistheseis at L4-L5.  [R. 456.]  Plaintiff was administered dilaudid and directed to discontinue Mobic and use ibuprofen.  [R. 461, 464.]

On a March 16, 2016, visit to Dr. Patterson, Plaintiff reported that she had constant difficulty with pain and pain in her lower back and that she was depressed and cried all the time.  [R. 403.]  Dr. Patterson noted that Plaintiff's pain in her lower back decreased her range of motion.  [R. 405.]  He also noted left hip pain.  [R. 405.]  He assessed hypertension, degeneration of intervertebral disc of the lumbar region, generalized osteoarthritis, and arthralgia of the lower leg.  [R. 405.]  He prescribed naproxen and duloextine and refilled alprazolam, lisinopril-hydrochlorothiazide, and hydrocodone-acetaminophen.  [R. 405.]

On April 12, 2016, Plaintiff visited the emergency room, complaining of lower extremity pain.  [R. 430.]  She reported that for two months she had had left groin pain that was radiating to her left thigh.  [R. 430.]  She described the severity of the pain as moderate.  [R. 430.]  It was noted that Plaintiff had moderate tenderness to her left hip, which was limiting her range of motion.  [R. 431.]  Plaintiff was also noted to have a limping gait.  [R. 431.]  She was administered dilaudid and diagnosed with chronic left thigh and knee

---

[10]The CT report also stated, "No fracture or destructive lesion was suggested.  Minimal subchondral cystic change, superolateral left acetabulum."  [R. 415.]

pain.  [R. 434, 436, 437.]  She was instructed to use crutches as needed and to follow up orthopedist Phillip Milner.  [R. 437.]

Plaintiff saw Dr. Milner one week later on April 19, 2016, and complained of left hip pain and back pain.  [R. 471.]  Examining her, Dr. Milner noted that she had pain in her groin and gluteal areas.  [R. 471.]  He observed that she had pain with internal rotation and only had about 20 degrees of internal rotation; her external rotation was to 30 degrees with pain and a firm endpoint; flexion was to 90 degrees; and she had a panniculus.  [R. 471.]  He noted that x-rays and CT confirmed that Plaintiff had "moderate to severe osteoarthritis of the left hip."  [R. 471.]  Despite the severity of the osteoarthritis, Dr. Milner also noted that surgery would be expensive for her because she had no insurance.  [R. 471.]  He further noted that she had "been taking hydrocodone 4 a day for an extended period of time and that could also be problematic for recovery from a hip arthroplasty if it was considered."  [R. 471.]  He suggested an injection of the hip for temporary relief and then continuing naproxen.  [R. 471.]  He opined that she would be out of work indefinitely.  [R. 471.]

On August 29, 2016, an x-ray of Plaintiff's left knee showed mild joint space narrowing and marginal osteophyte formation seen at the medial weight bearing joint compartment.  [R. 480.]

On October 6, 2016, Plaintiff visited Earl Hutchins, M.D.  [R. 507.]  She complained of left hip pain and reported that she could not stand or walk.  [R. 507.] Dr. Hutchins assessed depression with anxiety, hypertension, degenerative disc disease, arthritis, chronic

back pain, and chronic insomnia. [R. 508.] He prescribed hydrocodone, naproxen, hydroxyzine, and lisinopril. [R. 509.]

On November 7, 2016, Plaintiff returned to Dr. Hutchins, complaining of chronic pain and anxiety. [R. 504.] She reported left hip pain and stated that she was receiving treatment from orthopedics for that pain. [R. 504.] Dr. Hutchins assessed chronic back pain, depression with anxiety, chronic anxiety, and hypertension. [R. 505.] He prescribed alprazolam, and he refilled hydrocodone, Cymbalta, and lisinopril. [R. 505–06.]

On December 7, 2016, nurse practitioner Jo Hammett evaluated Plaintiff for a follow-up. [R. 500.] Plaintiff told her that she was no longer seeing orthopedics for hip pain and that she was unable to afford surgery. [R. 500.] She reported that she had severe arthritis in her right hip and needed crutches to walk. [R. 500.] She reported that she had fallen on Thanksgiving and jarred her right hip but had not sought medical attention; she had degenerative disc disease in her lower back; she had had a bad cold that she had had for three or four weeks; and her anxiety was okay. [R. 500.] Ms. Hammett assessed hypertension, chronic anxiety, depression with anxiety, and chronic back pain. [R. 502.] She prescribed hydrochlorothiazide. [R. 502.]

On January 19, 2017, Plaintiff saw Locke Simons, M.D., requesting medication refills. [R. 496.] Plaintiff reported she had been denied disability. [R. 496.] Plaintiff reported that she had some sharp epigastric pain that was better with Zantac and that she was having some good responses to vitamin D. [R. 496.] Dr. Simons assessed hypertension, depression with anxiety, degenerative disc disease of the lumbosacral spine, arthritis,

hypercholesterinemia, vitamin D deficiency, hypertension and morbid obesity.  [R. 498.]  He discontinued pravastatin, prescribed lovastatin and amlodipine, and refilled hydrocodone, alprazolam, hydrochlorothiazide, and lisinopril.  [R. 498.]

On February 21, 2017, Plaintiff was seen by Steven Murrell, M.D.  [R. 492.]  Plaintiff complained of pain in her right wrist.  [R. 492.]  She also reported that walking was terribly painful and that she had been offered a hip replacement but could not afford one.  [R. 492.]  Dr. Murrell assessed chronic anxiety, hypertension, arthritis of the left hip, and alcohol abuse.  [R. 494.]  He prescribed alprazolam and he refilled hydrocodone and amlodipine.  [R. 494.]

Plaintiff saw Dr. Murrell again on March 27, 2017, requesting refills of her medication for chronic hip pain.  [R. 522.]  Dr. Murrelll assessed hypertension and arthritis of the left hip.  [R. 490–91.]  However, he informed her that he would no longer prescribe narcotics and he would refer her to the Greenville clinic as a charity case.  [R. 491.]

On October 27, 2017, Dr. Patterson evaluated Plaintiff for follow-up.  [R. 591.]  Plaintiff reported an abscess on her right lateral buttock.  [R. 595.]  She complained of chronic depression and chronic back pain.  [R. 595.]  Dr. Patterson noted that Plaintiff had difficulty bending and stooping.  [R. 597.]  He noted that her right buttock was opened and a large amount of pus exuded.  [R. 596–97.]  Dr. Patterson assessed hypertension, degeneration of intervertebral disc of the lumbar region, and generalized osteoarthritis.  [R. 597.]    He prescribed sulfamethoxazole-trimethoprim, and he refilled naproxen, hydrocodone, and alprazolam.  [R. 597.]

On January 24, 2018, Plaintiff again saw Dr. Patterson, complaining of marked pain in her knees and back.  [R. 606.]  He noted that she remained morbidly obese and was using crutches to ambulate.  [R. 606.]  She reported that she was seeking disability based on her reduced ability to walk and function.  [R. 606.]  She reported that she had not been compliant with taking her blood pressure medications.  [R. 606.]  Dr. Patterson noted that Plaintiff had hypertension; marked deformity with both knees; and weakness with straight leg raising with both legs, with the left leg being worse.  [R. 606.]  He refilled alprazaolam, hydrocodone, and naproxen.  [R. 608–09.]

On April 24, 2018, Dr. Patterson evaluated Mathis for follow-up and medication refills. [R. 613.]  He increased Plaintiff's lisinopril-hydrochlorothiazide to 20 mg and refilled her duloxetine, alprazolam, and naproxen.  [R. 616–17.]

On July 24, 2018, Plaintiff saw Dr. Patterson, reporting that although Cymbalta had helped with her depression, the depression had been worse recently.  [R. 634.]  She complained of pain in her left hip and knee that was worsened with overexertion.  [R. 635.]  Dr. Patterson assessed hypertension, degeneration of intervertebral disc of the lumbar region, depression, and arthralgias of the lower leg.  [R. 636–37.] He refilled spironolactone, alprazolam, naproxen, and duloxetine.  [R. 637.]

### Dr. Patterson's Medical Source Opinion

On October 27, 2017, Dr. Patterson completed a medical source statement for Plaintiff.  [R. 587–90.]  He indicated that she could occasionally lift and or carry less than 10 pounds for a total of about a third of an eight-hour workday; she could not frequently lift and

22

or carry, and push and or pull, any weight for a total of two-thirds of an eight-hour workday;

her impairments affected her standing and walking and her sitting; that she could stand and

or walk for a total of three hours in an eight-hour workday, with a maximum of 30 minutes

uninterrupted; she could sit for a total of four hours in an eight-hour workday, with a

maximum of 30 minutes uninterrupted; and she could never climb, balance, stoop, crouch,

kneel, or crawl.  [R. 587–88.]  Dr. Patterson noted that Plaintiff's impairment affected her

ability to handle but not her ability to finger, reach, feel, see, hear or speak.  [R. 589.]  He

indicated that her impairment was affected by heights, moving machinery, temperature

extremes, chemicals, dust, noise, fumes, humidity, and vibration; and that her ability to

stand and tolerate work or environmental factors depended on her fatigue.  [R. 589–90.]  He

noted that Plaintiff's limitations and the degree of those limitations were in line with what

would be normally expected given the type and severity of her diagnoses.  [R. 590.]  He also

indicated that her diagnoses were based both on Plaintiff's subjective complaints and on

objective factors.  [R. 590.]

### Weight the ALJ Assigned to Dr. Patterson's Opinion

The ALJ discussed Dr. Patterson's opinion as follows:

> I give limited weight to the October 2017 opinion by medically
> acceptable treating source Melmoth Patterson, M.D., (11F)
> based on the following.  Dr. Patterson has treated [Plaintiff]
> from at least February 2011, has seen her on a fairly regular
> basis, and has prescribed related medications (1F, 9F, 12F).
> However, Dr. Patterson is a family practice physician, and not
> a specialist.  Additionally, Dr. Patterson gave his opinion in a
> check the box form, with no explanation or basis for his
> limitations.  Dr. Patterson opined that [Plaintiff] was limited in
> her ability to finger; however, [Plaintiff] has not alleged this as

23

a limitation, nor d[id] any physical exam show[] any related positive pertinent findings. Finally, Dr. Patterson's opinion is not supported by his own treatment notes. This opinion coincides with an office visit where physical exam showed that she had chronic low back pain and difficulty bending and stooping; however, straight leg raise was negative and gait was normal (12F/7). Additionally, April, and July 2018 exams were normal (12F/34, 46), and related fall risk screening showed no indication that she used an ambulatory aid (12F/37, 49). Finally, April 2018 notes show that she ambulated fairly well, but was morbidly obese which decreased her function ability (12F/34).

Dr. Patterson used the term "limited," which lacks specificity and is not defined in the DOT or in accordance with our agency definitions. Therefore I'm left to speculate what is meant by "limited." Dr. Patterson precluded [Plaintiff] from any climbing, balancing, stooping, crouching, kneeling, and crawling, which is not consistent with the physical exams, which did show some limited range of motion, but it was not precluded. Finally, Dr. Patterson's opinion is not supported by the objective medical evidence or consistent with the record as a whole, as fully explained below.

[Dr. Patterson's opinion is] not supported by the objective medical evidence. First, objective imaging generally showed mild, and sometimes moderate, findings (2F/1-2, 39, 3F/42, 38, 6F, see also 8F/5). At the September 2016 State agency CE, Dr. Arrojas noted multiple times throughout his exam findings that [Plaintiff] appeared to have pain significantly out of proportion to the physical exam. Dr. Arrojas also noted that there was no objective evidence to support [Plaintiff's] level of pain and her inability to apply weight to her left lower extremity (6F). Further, several physical exams were normal (see e.g. 8F/8-9, 12, 13, 16, 19, 12F/34, 46). Finally, all exams showed normal muscle strength, bulk, and tone (see e.g. 5F).

[Dr. Patterson's opinion is also] not consistent with the record as a whole. Throughout the longitudinal record, various treatment notes show how [Plaintiff's] pain was out of proportion to physical exam findings, most notably at the September 2016 State agency CE (5F). Additionally, in October 2016, [Plaintiff] complained of left hip pain and that she was unable to stand or walk. However, exam showed only that her left hip was tender to palpation. Follow-up November

24

2016 exam was normal (8F/18-19, 16).  Notably, in February 2017, Dr. Murrell stated, "[Plaintiff] seems adamant that she needs to have disability.  I informed her that it is unlikely that it will be approved, when there is an operation that could correct her problem.  She needs to continue to pursue obtaining Medicaid" (8F/5).  Finally, the longitudinal record shows that prior to stopping work, [Plaintiff] alleged similar pain levels as she has since the alleged onset date of January 1, 2016.  For example, in September 2015, when [Plaintiff] was working part-time in the cafeteria, she reported a pain score of 8/10 with medication (1F/9, 12 see also 9F/11, 28).  After the alleged onset date, [Plaintiff's] October 2017, April, July 2018 pain scores were 5/10, 7/10, 5/10, respectively (12 F/10, 37, 49).

[R. 33–34.][11]

***Discussion***

The Court concludes that to the extent that the ALJ decided to give little weight to Dr. Patterson's opinion, his analysis failed to comply with the treating physician rule.  The Fourth Circuit recently discussed the rule at length in *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020):

> In Social Security disability cases, the "treating physician rule" is well-established.  SSA instructs claimants that "[g]enerally," SSA will "give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."  20 C.F.R. § 404.1527(c)(2).

---

[11]The VE testified that if an individual were limited "to lifting occasional and frequent less than ten pounds, there would be no light duty by definition" and if an individual were "limited to stand/walk a total of three hours a day and s[]t a total of four hours a day, there would be no [j]ob in the national economy at any level that that person would be able to maintain." [R. 79.]

Accordingly, the treating physician rule requires that ALJs give "controlling weight" to a treating physician's opinion on the nature and severity of the claimant's impairment if that opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence" in the record. *Id.* Upon deciding not to give controlling weight to a treating physician's opinion, ALJs must determine the appropriate weight to be accorded to the opinion by considering "all of ... the factors" listed in the regulation, which include the length of the treatment relationship, consistency of the opinion with the record, and the physician's specialization. *Id.* § 404.1527(c)(2)–(6). SSR 96-2p further notes that "[i]n many cases, a treating [physician's] medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." 1996 WL 374188, at *4 (July 2, 1996) (emphases added).

We have emphasized that the treating physician rule is a robust one: "[T]he opinion of a claimant's treating physician [must] be given great weight and may be disregarded only if there is persuasive contradictory evidence." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In *Coffman*, the ALJ discredited a treating physician's opinion regarding the claimant's ability to work by stating that "[t]he weight to be given such [a] conclusionary statement depends on the extent to which it is supported by specific and completed clinical findings and other evidence. I find that this conclusionary statement does not have the required support in the record." *Id.* at 517–18. We held that the ALJ misstated the legal standard because a "treating physician's testimony is ignored only if there is persuasive contradictory evidence." *Id.* at 518 (quoting *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986)).

Here, the ALJ made the same legal error. While he reasoned that the "lack of substantial support from the other objective evidence of record" rendered Dr. Harper's opinion "less persuasive," A.R. 514, the law makes it clear that such support is not necessary for according controlling or great weight to a treating physician's opinion. Rather, the opinion must be given controlling weight unless it is based on medically unacceptable clinical or laboratory diagnostic techniques or is contradicted by the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Coffman*, 829 F.2d at 517. Therefore, the ALJ applied an incorrect legal standard, contravening both

26

> agency policy and Fourth Circuit law.  *See Hines*, 453 F.3d at
> 561 (holding that ALJ applied an "improper standard to
> disregard the treating physician's opinion that [claimant] was
> fully disabled").

*Id.* at 106–07.

Here, as in *Arakas*, the ALJ cited various reasons for discrediting the doctor's opinion regarding the severity of his patient's symptoms and the effect on the patient's functionality [R. 33–34], but none of them were based on unacceptable clinical or laboratory diagnostic techniques or substantial evidence in the record that contradicted the doctor's opinion.  *See Small v. Saul*, 2:20-cv-00970-RMG-MGB, 2021 WL 1877766, at *9 (D.S.C. Apr. 23, 2021) (holding that the ALJ erred in not affording treating physician's opinion controlling weight when "the ALJ's analysis fail[ed] to establish that [the] opinion [was] based on medically unacceptable clinical or laboratory diagnostic techniques or [was] contradicted by the other substantial evidence in the record"), *Report and Recommendation adopted by* 2021 WL 1863257 (D.S.C. May 10, 2021).  The Court will discuss seriatim the various reasons the ALJ identified for discrediting Dr. Patterson's opinion.

First, the ALJ's observation that Dr. Patterson was a family practice physician rather than a specialist plainly does not fit within any of the *Arakas* categories.

Second, the Court notes that some of the reasons cited by the ALJ for assigning little weight to the treating physician's opinion are in the nature of criticisms that Dr. Patterson did not further clarify his opinion or explain his reasoning.  In this category would be the ALJ's observations that Dr. Patterson's opinion was stated on a box-check form and that he

used the term "limited" at some point in his medical source opinion.[12]  These reasons do not fit within the categories discussed in *Arakas* and thus are not adequate bases for rejecting the treating physician's opinion.  And the Court notes that to the extent that the ALJ was unclear about Dr. Patterson's opinion, he could have sought additional information or directed Plaintiff to obtain clarification.  *See Stacy v. Saul*, No. 2:18-cv-01579, 2019 WL 3781280 at *5 n.3 (D.S.C. July 26, 2019), *Report and Recommendation adopted by* 2019 WL 3780412 (D.S.C. Aug. 12, 2019).

Next are the several observations that the ALJ cites as support for his conclusion that Dr. Patterson's own treatment notes do not support his opinion.  These observations are not satisfactory either because the ALJ does not explain how anything in the notes contradicts Dr. Patterson's opinion.  That is particularly true of Dr. Patterson's views that Plaintiff could not lift 10 pounds for a third of an eight-hour workday, could not stand or walk for more than three hours in an eight-hour workday, and could not sit for more than four hours of an eight-hour workday.  The observations the ALJ cited as being at odds with Dr. Patterson's opinion include (1) that on the date Dr. Patterson authored his medical source opinion, Plaintiff's straight leg raise was negative and her gait was normal, (2) that Plaintiff's exams in April and July 2018 were normal, (3) that her related fall risk screening showed no indication that she used an ambulatory aid, and (4) that the April 2018 notes described her as ambulating fairly well but that she was morbidly obese, which reduced her functionality.  The ALJ provides

---

[12]The Court is unable to find the word "limited" in Dr. Patterson's medical source opinion and is unclear as to what the ALJ is referring to.

28

no explanation as to why these cherry-picked facts would conflict with the limitations at issue.

Nor does the ALJ explain any conclusion that any objective evidence outside of Dr. Patterson's treatment notes contradicted Dr. Patterson's opinion. It appears that a substantial portion of the ALJ's reasons for discrediting Dr. Patterson's opinion concerned the ALJ's belief that Plaintiff, who at times indicated that she could not stand or walk at all, was exaggerating the severity of her limitations. [*E.g.*, R. 33 (noting that Plaintiff complained in October 2016 that she could not stand or walk; noting that a state agency consulting examiner stated that Plaintiff appeared to be claiming to have pain out of proportion to what the objective evidence would support; noting another doctor's statement that Plaintiff seemed "'adamant that she needs to have disability'").] But the ALJ does not explain why his belief that *Plaintiff* was exaggerating would be a basis for rejecting *Dr. Patterson's* assessment of his patient's limitations. Nothing indicates that Dr. Patterson uncritically adopted Plaintiff's representations regarding her subjective feelings. Dr. Patterson unambiguously stated that his opinion was based not only on consideration of her subjective statements but also on the objective facts that he observed. [R. 590.] And Dr. Patterson, considering all of this evidence, *rejected* the position that Plaintiff could not walk or stand when he opined that she could walk or stand for three hours of an eight-hour workday. The ALJ did not satisfactorily explain how any objective evidence contradicted that opinion.[13]

---

[13]The Court notes as well that the ALJ's determination that Plaintiff could stand or walk for four hours of an eight-hour workday is not tremendously different from Dr. Patterson's determination that Plaintiff could stand or walk for three hours. It would be a tricky task for

The ALJ also does not identify what evidence he believed was inconsistent with Dr. Patterson's view that Plaintiff could not climb, balance, stoop, crouch, kneel, or crawl.  [*See* R. 33 (stating that Dr. Patterson's view that Plaintiff could not perform these functions was "not consistent with the physical exams").]  In the context of discrediting the opinion of another doctor—Plaintiff's treating orthopedist, Dr. Miller—who embraced the same restriction, the ALJ appeared to reject it because the objective evidence showed that Plaintiff had some ability to stand and walk, yet "[Plaintiff] would not be able to stand or walk if she was precluded from any type of balancing."  [R. 32.]  However, given that Dr. Patterson opined that Plaintiff could stand or walk for three hours and sit for six hours out of an eight-hour workday, Dr. Patterson plainly did not doubt that Plaintiff could do the "balancing" necessary to sit up, stand, and walk in good conditions.  Rather, Dr. Patterson appears to have used "balancing" to refer to balancing above and beyond the basic amount necessary to sit, stand, or walk on a level surface with good traction.[14]

The ALJ also points to the facts that "objective imaging generally showed mild, and sometimes moderate, findings" and "all exams showed normal muscle strength, bulk and tone."  [R. 33.]  First of all, however, as the ALJ himself acknowledged, Plaintiff's treating orthopedist, Dr. Milner, "noted that imaging confirmed *moderate to severe* osteoarthritis of

---

the ALJ to explain how four hours was correct but the imaging *contradicted* Dr. Patterson's three-hour limitation.

[14]The ALJ pointed to Dr. Patterson's indication that Plaintiff's impairments limited her fingering ability.  [R. 33.]  However, the ALJ points to no evidence contradicting the existence of that limitation.

the left hip." [R. 26 (emphasis added); *see* R. 471.] The ALJ does not explain why he would reject this characterization of the imaging by Plaintiff's treating orthopedist. In fact, Dr. Milner appeared to suggest that her hip osteoarthritis was so serious that she could have benefitted from hip replacement surgery. [R. 471.] Indeed, he indicated it was only her inability to afford the surgery—because she did not have insurance—and the fact that she had been taking hydrocodone four times per day for an extended period—which would make recovery from the surgery problematic—that precluded surgery as an option. [R. 471.] In any event, regardless of what adjectives are used to describe the imaging, particularly as it pertained to her left hip, the ALJ does not explain why he believed that the imaging contradicted the particular limitations Dr. Patterson embraced.

In sum, it is the ALJ's duty to "build an accurate and logical bridge from the evidence to his conclusion." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). With the ALJ not having done so here, meaningful substantial evidence review is not possible regarding the issue of whether he ALJ properly evaluated Dr. Patterson's opinion. The Court therefore recommends that the ALJ's decision be reversed and the case remanded for further proceedings so that the ALJ can evaluate the evidence in accordance with the applicable rules and adequately explain his decision.

**Remaining Allegations of Error**

The Court has found sufficient basis to remand this matter based on the ALJ's failure to properly explain his evaluation of Dr. Patterson's opinion. Additionally, on remand, the ALJ should take into consideration Plaintiff's remaining allegations of error.

**RECOMMENDATION AND CONCLUSION**

Wherefore, based upon the foregoing, the undersigned recommends that the Commissioner's decision be REVERSED pursuant to sentence four of 42 U.S.C. § 405(g), and that the case be REMANDED to the Commissioner for further administrative action consistent with this Report and Recommendation.

IT IS SO RECOMMENDED.

<u>s/Jacquelyn D. Austin</u>
United States Magistrate Judge

September 28, 2021
Greenville, South Carolina